IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| DEATRA L. WOODS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 2:08CV922-SRW |
| | ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OF OPINION**

Plaintiff Deatra L. Woods brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

Plaintiff filed an application for Supplemental Security Income (SSI) on January 27, 2006. (R. 54-57). She alleged that she became unable to work ten days earlier, on January 17, 2006, due to grand mal seizures. (R. 66). She reported that she was receiving treatment from Dr. Vyas for "blood work[] and Low Sugar," and from Dr. Prince for seizures, "nerves" and migraine headaches (R. 68), and that she was taking medications for "back surgery," "nerves," high blood pressure, and seizures (R. 71). In a decision issued on April

9, 2008, the ALJ found that plaintiff has "severe" impairments of seizure disorder[1], migraine headaches[2], status post lumbar surgery [3], degenerative joint disease and depression. (R. 21). He determined that her residual functional capacity precludes her past relevant work but that she can perform other jobs that exist in significant numbers in the national economy and, accordingly, that she is not disabled. (R. 25-26). Plaintiff filed the present action after the Appeals Council denied her request for review.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole

---

[1] Plaintiff sought treatment at the Andalusia Regional Hospital a dozen times between December 2005 and March 2007, reporting that she had suffered seizures at home. (Exhibits 1F, 2F, 3F, 6F, 7F, 11F, 16F, 17F, 18F, 22F, 24F, 25F). CT scans were essentially normal and EEGs showed no evidence of seizure activity. (See R. 121-22, 136, 145, 147, 353, 358). In treatment notes for plaintiff's ER visit on March 25, 2007, the ER physician indicated that plaintiff had frequent ER visits with "very atypical" seizures both by history and by examination, that her behavior was "not consistent [with the] alleged diagnosis," and that she was "[h]aving apparent seizure like activity but can understand everything being said and can respond to it." (R. 334). The medical records before the court do not evidence any subsequent visits to the ER for seizure symptoms, but do include treatment notes showing that plaintiff was treated by a neurologist, Dr. Alan Prince, on February 15, 2006 and March 1, 2006, for seizures. (Exhibit 4F). On June 18, 2007, plaintiff told her mental health counselor that her seizures were "under control medically." (R. 368). Plaintiff testified that she had frequent seizures "until [her] doctor got them under control," and that now she generally has only minor seizures for which she does not "have to go to the hospital." (R. 427). She testified that she had a major seizure the Saturday before the administrative hearing (in mid-March 2008), for which she "had to go to the hospital." (Id.).

[2] Plaintiff testified that she does not have "major" migraines often, but that she has "miniature migraines . . . pretty often." (R. 428).

[3] Plaintiff testified that she had back surgery for lumbar radiculitis in 1995 or 1996 (R. 426-27) but she provided no medical records pertaining to the surgery. The earliest medical treatment notes in the record are dated in December 2005, the month before plaintiff filed her application for disability. (See R. 118-28, 354; see also R. 68-69 (disability report listing medical records only since January 2006)).

to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

The plaintiff contends that the Commissioner's decision is due to be reversed because: (1) the ALJ failed to explain the weight he gave to the mental RFC form completed by plaintiff's treating psychiatrist; (2) the ALJ erred by failing to find that plaintiff "suffers from severely impairing anxiety[;]" and (3) the ALJ gave significant weight to the opinion of a non-examining state agency disability expert. (R. 6).[4]

### Dr. Serravezza's Mental RFC Opinion

---

[4] Plaintiff's argument is directed entirely to plaintiff's mental limitations; she does not challenge the ALJ's conclusions regarding her physical limitations. (See Plaintiff's brief, pp. 6-13). The ALJ determined that plaintiff is limited to work at the medium exertional level, and with no exposure to dangerous heights or machinery, no climbing of ladders, ropes and scaffolds, and no driving of automotive vehicles. (R. 21). The court concludes, after reviewing the entire record, that the ALJ's findings regarding plaintiff's physical limitations are supported by substantial evidence and proper application of the law. Since plaintiff does not challenge these findings, the court will confine its discussion to evidence and law relevant to the ALJ's treatment of plaintiff's mental limitations.

Plaintiff's primary care physician, Dr. Vyas, treated plaintiff on a number of occasions between December 2005 and October 2007. Although plaintiff generally presented with physical complaints, Dr. Vyas also occasionally assessed depression, and he regularly prescribed either Ativan or Xanax for the plaintiff. (Exhibits 26F, 28F, 29F). On April 1, 2006, plaintiff's neurologist reported that plaintiff's "depression is getting better on Prozac 40 mg a day." (R. 145). Later in April, plaintiff told a disability examiner that she had not been treated by a psychiatrist for her depression (R. 91); on May 23, 2006, she went to South Central Alabama Mental Health ("SCAMH"), requesting mental health services for depression (R. 308). She reported "feeling sad," "having bad nerves," and "being forgetful," and also reported medical problems of "grand mal seizures" and "hypertension." (R. 308, 311). SCAMH scheduled plaintiff for an intake appointment on June 20, 2006. (R. 308).

At the intake appointment, plaintiff reported a greatly decreased level of functioning since her seizures began. She told the counselor that she experiences extreme memory problems, depression and social anxiety. (R. 320). The counselor assessed major depression and social phobia, and assigned a GAF (Global Assessment of Functioning) score of 40 (R. 321).[5] She admitted plaintiff to the SCAMH's outpatient program and referred her to the psychiatrist. (R. 22-23).

Plaintiff saw the psychiatrist, Dr. Serrevezza, on August 1, 2006. She told Dr. Serrevezza that she had been taking Prozac for two years, "[without] relief from depression

---

[5] The counselor's assessment was later approved by psychologist Sharon Brown, Ph.D., SCAMH's clinic director. (R. 304, 321). A GAF score of 31-40 reflects the counselor's judgment that plaintiff was experiencing "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood[.]" American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed.), DSM IV-TR, p. 34.

or anxiety." She reported that her seizures were stabilized on Dilantin, but that she had "break thru seizures" when she got angry or upset, and that she was having anxiety, panic, depression and migraine headaches. Dr. Serrevezza noted that plaintiff's behavior was "normal" but "[slightly] passive," and that her mood was "[slightly] depressed" but noted no other abnormalities. Dr. Serrevezza started plaintiff on Lamictal. (R. 302).

At plaintiff's follow-up appointment six weeks later, Dr. Serrevezza recorded plaintiff's "Depressed" mood and "Labile" affect; "fair" memory, attention span and judgment/insight, and impulse control; and "concrete" thought process. Dr. Serrevezza's written notes for the session pertained to the pharmacist's refusal to fill the Lamictal prescription because of its interaction with Dilantin. Dr. Serrevezza discussed the issue with the pharmacist, but he was "uncertain." Plaintiff was to see Dr. Prince, her neurologist, in eight days and discuss the issue with him. (R. 301).

Dr. Serrevezza saw plaintiff for the third time on October 17, 2006. Plaintiff was still not taking the Lamictal; she reported that her last appointment with Dr. Prince was canceled but that she was due to see him the next week. She reported a recent ER visit in which she was diagnosed with a "pseudoseizure" and administered IV Dilantin. She was "coming off Xanax" – she had two doctors prescribing it for her but was out of the medication. She reported migraines, more "spells," and that she was not sleeping and "not functioning well." Under the section for "Current Mental Status," Dr. Serrevezza recorded plaintiff's behavior as "sl Bizarre," her affect as "sl Labile," and her alertness as "sl Dull." She noted "fair" impulse control, judgment/insight, attention span, and memory. As to plaintiff's thought

5

process and content, Dr. Serrevezza noted "sl Circumstantial," "Disorganized," and "Concrete," and "talking [with] self." She wrote, "Very distressed, agitated, vague 'hard time' – very disorganized (psychotic or postictal)[.]" Dr. Serrevezza prescribed Seroquel and again prescribed Lamictal. (R. 300).

On the same day, Dr. Serrevezza also completed a questionnaire which asked that she provide her "estimate of the claimant's current psychiatric/psychological impairment" by rating plaintiff's estimated degree of impairment or restriction in eighteen functional areas by circling "mild," "moderate," "marked," or "extreme." Dr. Serrevezza estimated plaintiff's degree of impairment as "marked" as to her ability to interact appropriately with the general public, to ask simple questions or request assistance, and to get along with co-workers or peers, and also rated the "degree of constriction of interests of the claimant" as "marked." In all other areas, Dr. Serrevezza rated plaintiff's impairment as "extreme." She circled "Yes" in response to the question, "Have the claimant's impairments cause limitations that have lasted or can be expected to last 12 months or longer at the level or severity indicated?" Dr. Serrevezza added no notes in the section of the form asking for her "Comments." (R. 274-76).

Dr. Serrevezza next saw plaintiff two months later, on December 12, 2006. Under "Current Mental Status," she recorded plaintiff's mood as "sl Depressed" and "anxious." She noted "fair" memory, attention span, and judgment/insight; "good" impulse control; "Normal" thought content; and "Goal Directed" thought process. She noted that plaintiff's affect was "Appropriate," that she was "Fully Alert," and that she was oriented as to time,

6

place, person and situation.  She wrote that plaintiff "can't sleep," "still having migraines," and is "seeking meds for nerves."  Plaintiff asked Dr. Serravezza for some Cephadyn for her migraines, reporting that she had missed her appointment with Dr. Prince, and wanted some to "carry her [illegible] till after holidays."  She stated that the Seroquel was not helping with her "nerves."  Dr. Serravezza increased plaintiff's Seroquel dosage, continued plaintiff on the Lamictal, and gave her the Cephadyn she had requested.  (R. 299).

The next office treatment note from Dr. Serravezza is dated June 26, 2007, six months later.  (R. 361).  Under "Current Mental Status," Dr. Serravezza recorded plaintiff's behavior as "passive,"[6] and indicated that she was "Fully Alert," and oriented as to time, place, person and situation.  Her mood was "Depressed," and her affect was "Appropriate."  Her thought process and content were "Goal Directed" and "Normal," and she had "fair" memory, attention span, judgement/insight and impulse control.  Dr. Serravezza noted "Somatic pain."  Plaintiff reported fewer seizures and was "still [complaining of] anxiety, depression, pain.  [Headaches] persist."  Dr. Serravezza spoke with plaintiff about adding Cymbalta to plaintiff's medication regime; she noted "[Patient] prefers a new approach that includes antidepressant."  She started plaintiff on Cymbalta and continued her on Lamictal and Seroquel.  (R. 361).

Dr. Brown, the SCAMH psychologist, had assessed plaintiff with "Major Depressive Disorder Single Episode Severe," and "Social Phobia" a week earlier. She assigned a current

---

[6] She wrote a word beside her checkmark, but it is illegible.

GAF score of 70.[7] (R. 363). Dr. Serrvezza next saw plaintiff five months later, on November 13, 2007. She recorded plaintiff's mood as "Depressed" and noted that plaintiff was "[g]rieving death of mother – some anxiety spells – uses Xanax prn – I agreed to refill x 1 mo. for prn use.  Also feel she would benefit from [increasing] Cymbalta."  (R. 383).

Plaintiff argues that "the Commissioner's decision should be reversed because although the ALJ summarized the mental residual capacities form completed by Ms. Wood's treating psychiatrist, Dr. Serravezza, he failed to explain if any weight was given to this assessment." Plaintiff further contends that the ALJ "failed to comply with 20 C.F.R. § 404.1527 by failing to provide any reasons whatsoever for his obvious rejection of this opinion." (Plaintiff's brief, pp. 6-7).

Plaintiff contentions are without merit. The ALJ did state his reasons for rejecting Dr. Serravezza's opinion. He wrote:

> I have given no weight to the form signed by Dr. Serravezza. That opinion is inconsistent with her own office notes, and with the credible opinions of Dr. Simpson and Dr. Brown and the observations of Dr. Butler.  It is also grossly inconsistent with the wide range of activities of daily living and, inferentially, takes the position, unsupported by the evidence, that the claimant's condition has not and will not respond favorably to medical treatment. . . . The opinion does not even identify an impairment associated with the limitations.

(R. 20).

To the extent plaintiff's argument could be construed to extend to the substantive propriety of the ALJ's decision to reject Dr. Serravezza's opinion, the court rejects the

---

[7] A GAF score in the range of 61-70 reflects "Some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed.), DSM IV-TR, p. 34.

argument. The fact that Dr. Serravezza did not include plaintiff's diagnoses in the form she completed on October 17, 2007 provides no basis for rejecting that opinion, since her treatment notes for the same day include diagnoses of major depression and social phobia. (R. 300). Dr. Butler provided no mental health treatment to the plaintiff and recorded no observations regarding her mental status.[8] His treatment notes, accordingly, provide little reason for discounting Dr. Serravezza's opinion, except to the limited extent that he saw plaintiff a mere six days after Dr. Serravezza observed that plaintiff was very distressed and agitated, exhibited bizarre behavior, talked to herself, and was "very disorganized (psychotic or postictal)," but apparently observed no behavior which he deemed to warrant inclusion in his treatment notes. (Compare R. 300 and R. 419-21).

However, other reasons articulated by the ALJ for rejecting the opinion are more than adequate and are supported by substantial evidence. Dr. Serravezza's own treatment notes, for the few other occasions on which she saw the plaintiff – August 1, 2006, September 19, 2006, December 12, 2006, June 26, 2007, and November 13, 2007 (R. 299, 301, 302, 361, 383) – include no observations suggesting the drastic limitations indicated by Dr. Serravezza on the questionnaire. Indeed, Dr. Serravezza did not see plaintiff at all for over six months between December 2006 and June 2007 and made no adjustments to her medications during that period. (R. 385; See Exhibits 23F, 27F, 30F.) Additionally, as the ALJ notes, plaintiff's activities of daily living are inconsistent with the marked and extreme limitations expressed

---

[8] Dr. Butler treated plaintiff once on October 23, 2007, twice in January 2008, and once on March 6, 2008 for physical complaints including hypertension, headaches, seizures, bronchitis, sore throat, congestion, cough, and low back pain. (Exhibit 32F).

by Dr. Serravezza. (Compare, *e.g.*, R. 94-98, Daily Activities Questionnaire (plaintiff socializes with church family, visits with family or friends once or twice a week, cooks, and does laundry) and R. 431 (plaintiff's hearing testimony that she has anxiety attacks and cannot stand crowds but is able to attend church) with R. 274, Item Nos. 6, 19 (Dr. Serravezza's opinion that the degree of restriction of plaintiff's "daily activities, e.g., ability to attend meetings (church, school, lodge, etc.), work around the house, socialize with friends and neighbors, etc." is "extreme" and that this level of restriction has either lasted or can be expected to last 12 months or longer)). As noted above, Dr. Brown assessed a GAF score of 70 on June 21, 2007. (R. 363).

"If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight." Roth v. Astrue, 249 Fed. Appx. 167, 168 (11th Cir. 2007)(unpublished opinion)(citing 20 C.F.R. § 404.1527(d)(2)). "If the treating physician's opinion is not entitled to controlling weight, . . . 'the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.'" Id. (citing Crawford v. Commissioner, 363 F.3d 1155, 1159 (11th Cir. 2004)). "If the ALJ finds such good cause and disregards or accords less weight to the opinion of a treating physician, he must clearly articulate his reasoning, and the failure to do so is reversible error." Pritchett v. Commissioner, Social Security Admin, 315 Fed. Appx. 806 (11th Cir. 2009)(unpublished opinion)(citing MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir.

1986)). "When the ALJ articulates specific reasons for not giving the treating physician's opinion controlling weight, and those reasons are supported by substantial evidence, there is no reversible error. Schuhardt v. Astrue, 303 Fed. Appx. 757, 759 (11th Cir. 2008)(unpublished opinion)(citing Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005)).

The ALJ has articulated reasons providing "good cause" for rejecting the opinion of Dr. Serravezza as expressed in Exhibit 20F and those reasons are supported by substantial evidence. Accordingly, plaintiff's arguments regarding the ALJ's failure to consider Dr. Serravezza's opinion are without merit.

### The ALJ's Consideration of Dr. Simpson's Opinion

Plaintiff argues that the Commissioner's decision is due to be reversed because the ALJ gave significant weight to the assessment of the State Agency disability experts, specifically, to the mental residual functional capacity assessment of Dr. Simpson. (Plaintiff's brief, pp. 11-12). Dr. Simpson, a non-examining agency psychologist, completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity form on July 10, 2006. (See Exhibits 13F, 14F). He noted Dr. Prince's diagnosis and treatment of plaintiff's depression and the diagnoses by Dr. Robert DeFrancisco, Ph.D., a consultative examining psychologist, of possible hysterical personality, probable borderline intellectual functioning and probable learning disorder NOS. He summarized plaintiff's activities of daily living as follows:

> Lives with family. Able to care for personal needs, cook and clean. She goes shopping with her husband. She has memory loss at times. Sometimes she can remember programs seen. No problems getting along with others. She visits with family, friends, and church members. Sometimes her husband reminds her to take meds.

(R. 218).[9] He concluded that plaintiff has "mild" restriction of her activities of daily living; "mild" difficulties in maintaining social functioning; "moderate" difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of extended duration. (R. 216). He found plaintiff to be moderately limited in her abilities to: interact appropriately with the general public; respond appropriately to changes in the work setting; maintain attention and concentration for extended periods; carry out detailed instructions; and understand and remember detailed instructions. As to all other rated mental abilities, he determined that plaintiff was not significantly limited. (R. 220-21). He concluded that she should have infrequent contact with the general public and infrequent changes in the workplace, but that she should be able to attend and concentrate for two-hour intervals and should be able to remember, understand and carry out short simple instructions. (R. 222). As plaintiff notes, the ALJ gave the assessments of the state agency disability experts "significant weight" (R. 21).[10]

---

[9] See also R. 94-98 (Daily Activities Questionnaire).

[10] The ALJ also relied on the opinion of the consultative examiner, Dr. DeFrancisco, that "the claimant can carry out, and remember instructions, and handle work pressure from a mental standpoint." (R. 21; see also Exhibit 8F, R. 169 ("She obviously can carry out, remember instructions and handle work pressure if she does not have a major seizure disorder, which apparently she has a normal CT scan and a normal EEG.")).

Social Security Ruling 96-6p provides that "[f]indings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of non-examining sources at the administrative law judge and Appeals Council levels of administrative review." The Ruling indicates that the medical opinions of such consultants must be considered, and states that "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." Where, as here, the ALJ has discounted the opinion of an examining source properly, the ALJ may rely on the contrary opinions of non-examining sources. See Milner v. Barnhart, 275 Fed. Appx. 947 (11th Cir. 2008)(unpublished opinion)(where ALJ rejected conflicting opinion of one-time examining physician properly, ALJ did not err by giving substantial weight to the opinions of non-examining psychologists); Wainwright v. Commissioner of Social Security Administration, 2007 WL 708971 (11th Cir. 2007)(unpublished opinion)(where ALJ rejected examining psychologist's opinion properly, the ALJ was entitled to rely on the opinions of non-examining state agency psychologists). The ALJ did not err by according substantial weight to Dr. Simpson's opinion.

### ALJ's Failure to Include "Anxiety" as a "Severe" Impairment

Plaintiff argues that the ALJ erred by failing to find that she suffers from the "severe" impairment of anxiety. (Plaintiff's brief, pp. 9-11). Even assuming that this constituted error, it would not warrant reversal in this case. Since the ALJ found that plaintiff suffered from

13

other "severe" physical and mental impairments and, therefore, proceeded beyond step two of the sequential analysis, any error in failing to classify plaintiff's "anxiety" as "severe" is harmless.  See McKiver v. Barnhart, 2005 WL 2297383 (D. Conn. 2005)("While plaintiff is correct that the ALJ, at step two, should screen out only *de minimis* claims, the ALJ in this case did not screen out plaintiff's claim at step two.  Rather, based on his finding of a severe *physical* impairment, he continued with the five-step sequential evaluation process, finding her 'not disabled' at step four based upon her residual functional capacity to perform her past relevant work. Thus, his failure to find that her mental impairment was 'severe' or to consider a combination of her physical or mental impairments [at step two] was, at worst, harmless error.")(citations omitted)(emphasis in original); see also Street v. Barnhart, 340 F.Supp.2d 1289, 1293-94 (M.D. Ala. 2004), *affirmed*, 133 Fed. Appx. 621 (11th Cir. May 18, 2005)(failure to list low IQ as a distinct severe impairment was harmless error where ALJ referred to plaintiff's "borderline intellectual functioning" in his decision and considered plaintiff's "severe and not severe impairments" in combination in subsequent analysis).

The ALJ was required to consider plaintiff's non-severe impairments in combination with her severe impairments in assessing her claim.  See Jones v. Dept. of Health and Human Services, 941 F.2d 1529, 1533 (11th Cir. 1991).  The ALJ's decision sufficiently indicates that he did so.  In Wilson v. Barnhart, 284 F.3d 1219, 1224 (11th Cir. 2002), the Eleventh Circuit held that an ALJ's statement that "'the medical evidence establishes that [Wilson] had [several injuries] which constitute a 'severe impairment,' but that he did not have an impairment *or combination of impairments* listed in, or medically equal to one listed in

14

Appendix 1, Subpart P, Regulations No. 4'" was "evidence that he considered the combined effects of Wilson's impairments." (alterations and emphasis in original). The Eleventh Circuit rejected the district court's determination that the ALJ had failed to discuss the cumulative effects of the plaintiff's impairments. In the present case, the ALJ likewise found that the plaintiff does not have "an impairment *or combination of impairments* that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1[.]" (R. 21, Finding no. 3)(emphasis added). In assessing plaintiff's mental residual functional capacity, the ALJ wrote:

> The claimant's mental residual functional capacity is for unskilled work that requires only occasional interaction with the general public and only occasional changes in the work setting. That is supported by the opinion of Dr. Simpson in Exhibit 14F; by the opinion of Dr. De[F]rancisco in Exhibit 14F; by the dramatic improvement with treatment reflected in the GAF of 70 found by Dr. Brown in Exhibit 27F at 5[.]

(R. 19). The court has no basis for concluding that the ALJ failed to consider anxiety-caused limitations at steps three and four of the sequential analysis. The ALJ's failure to list anxiety among plaintiff's severe impairments at step two does not warrant reversal.[11]

---

[11] In her description of Dr. DeFrancisco's report, plaintiff writes:

> He also diagnosed probable borderline intellectual functioning and stated that **Ms. Woods probably needs a WAIS-III to confirm this diagnosis.** Id. Further, Dr. DeFrancisco diagnosed Ms. Woods as having a **probable learning disorder and recommended a WRAT-III to confirm this diagnosis as well**. Id.

(Plaintiff's brief, p. 3)(emphasis in original). Plaintiff makes no further reference to these recommendations by Dr. DeFrancisco and makes no explicit argument regarding the emphasized text. The court notes that, in their multi-axial assessments, plaintiff's treating mental health practitioners made no diagnosis on Axis II, where a diagnosis of borderline intellectual functioning would be recorded. (See DSM IV-TR at p. 740, 743; R. 321 (Axis II notation of "V71.09," indicating that no Axis II diagnosis is present); R. 363; Exhibits 23F, 27F, 30F). Additionally, the court noted no reference to a learning disorder in the record other than plaintiff's self-report to Dr. DeFrancisco. (See R. 166). Plaintiff also told Dr. DeFrancisco that she "was in special

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is supported by substantial evidence and proper application of the law and, accordingly, that it is due to be AFFIRMED.  A separate judgment will be entered.

Done, this 31st day of August, 2010.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

education while in school, only going to the 6th grade." (Id.). Plaintiff's mother, however, indicated that plaintiff was not in special education classes and completed the ninth grade.  (R. 72).  At the administrative hearing, plaintiff testified that she went to school through the ninth grade and that she left school because she "had to help [her] mom. There was nin[e] of us kids and I had to help my mom out with bills and everything." (R. 425-26).  To the extent plaintiff intended the bold type to raise an argument of error, the court rejects the argument.